**Fred MIRON, Plaintiff,**

**v.**

**MENOMINEE COUNTY, Marinette County, Menominee–Marinette Twin County Airport Commission, James B. Busey and Federal Aviation Administration, Defendants,**

**and**

**City of Menominee, Michigan, and Michigan Department of Natural Resources, Intervening Defendants.**

**No. 2:92–CV–22.**

United States District Court, W.D. Michigan, N.D.

April 24, 1992.

Thomas A. Wilson, Appleton, Wis., for plaintiff.

Kim A. Coggins, Marinette, Wis., for Menominee County and Twin County Airport Com'n.

James E. Murphy, Marinette, Wis., for Marinette County.

Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, Mich., for F.A.A.

Janis M. Burgess, Menominee, Mich., for City of Menominee.

Stephen M. Rideout, Lansing, Mich., Asst. Atty. Gen., for Michigan Dept. of Natural Resources.

## MEMORANDUM OPINION AND ORDER

McKEAGUE, District Judge.

This action is brought under the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq. Plaintiff challenges, as procedurally defective, the grant of funding from the Federal Aviation Administration ("FAA") for landfill clean-up efforts currently underway in Menominee County. Now before the Court is plaintiff's motion for preliminary injunction, the effect of which would enjoin further clean-up efforts pending final adjudication of his claims. The Court considers the motion after having received briefs from all the parties and after conducting a six-hour fact-finding hearing on April 15 and 16, 1992.

## I. FACTUAL BACKGROUND

Plaintiff Fred Miron is a private citizen and resident of Menominee County. His residence is approximately 400 yards from the subject landfill area.

The landfill occupies approximately 20 acres just outside the city limits of the City of Menominee in Menominee County, Michigan. It was owned by the City of Menominee and operated as a solid waste disposal site until December 1982. In early 1983, the area was acquired and has continuously been held, as tenants in common, by the Menominee–Marinette Twin County Airport Commission ("TCAC"), Menominee County and Marinette County (Wisconsin).

In 1986, Michigan Attorney General Frank J. Kelley, on behalf of the Michigan Department of Natural Resources ("MDNR"), brought suit against the City of Menominee and the owners of the landfill area for injunctive relief and damages in connection with toxic and hazardous waste contamination of local soil, groundwater and surface water deemed to emanate from the landfill. This action in the Menominee County Circuit Court, resulted in award of summary judgment against the defendants (i.e., City of Menominee, the TCAC, and the two counties), and ultimately, by mutual consent of the parties, in an Order for Remedial Action dated April 20, 1989. The order required the defendants to implement the "Final Remedial Action Plan" prepared by STS Consultants, Ltd., including construction and installation of a "cover" over parts of the landfill area and of a purge well system.

In conjunction with this remedial action plan, the TCAC, Menominee County and Marinette County applied to the FAA for an Airport Improvement Program ("AIP") grant. It is anticipated the covered landfill will ultimately form the base for a runway approach lighting system. The FAA awarded a grant in the amount of $1,173,-512 on September 25, 1991.

In making its decision, the FAA did not require the performance of an environmental assessment or the preparation of an

environmental impact statement. This, plaintiff contends, is a violation of governing regulations and of NEPA. If an environmental assessment were performed and an environmental impact statement were prepared as required, plaintiff contends, then the inadequacies of the FAA-funded remedial action plan would be revealed and appropriate corrective measures would be undertaken to minimize further environmental contamination and wetlands destruction. Plaintiff urges the Court to enjoin further disbursement of FAA grant funds until the FAA complies with the law.

## II. PRELIMINARY INJUNCTION STANDARD

■ Plaintiff's motion for preliminary injunction asks the Court at an early stage in these proceedings, to determine whether equitable relief is warranted to preserve the status quo pending adjudication of plaintiff's claims on the merits. *Corbin v. Texaco, Inc.*, 690 F.2d 104, 105 (6th Cir. 1982). The factors which the Court employs in making this determination are well-established in this Circuit:

1. The likelihood of plaintiff's success on the merits;
2. Whether the injunction will save the plaintiff from irreparable injury;
3. Whether the injunction would harm others; and
4. Whether the public interest would be served by the injunction.

*In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985).

These are factors to be balanced, not prerequisites to be met. *Id.*, at 1229; *Michigan Coalition v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991). For instance, in general, the probability of success on the merits that must be shown is inversely proportional to the degree of irreparable injury plaintiff will suffer absent an injunction. *Id.; Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir.1987). However, "the demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless." *Id.* At a minimum, the movant must show "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendants if an injunction is issued." *Id.; DeLorean*, 755 F.2d at 1229.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

Under NEPA, all federal agencies, of which the FAA is one, are required to prepare a detailed statement on the environmental impact of "legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The manner in which this requirement is to be fulfilled is prescribed in regulations of the Council on Environmental Quality. 40 C.F.R. Part 1500. Further, implementation of these regulations by the FAA Airports Division is guided by Order 5050.4A.

When the FAA decided to award the AIP grant, it determined that no environmental impact statement ("EIS") was necessary for two reasons. First, it determined that FAA funding of the remedial action plan ordered by the Menominee County Circuit Court was a "non-major federal action" exempt from the NEPA EIS requirement (Def. Ex. D, p. 1). Second, award of the AIP grant was deemed to be an action categorically excluded from the EIS requirement under Paragraph 23 of FAA Order 5050.4A. (*Id.*) The FAA also observed, with respect to "construction impacts," that the capping of the landfill would be accomplished in accordance with the Menominee County Circuit Court's remedial action order. (*Id.*, p. 2).

In order to ultimately prevail on the merits of his claims, plaintiff must demonstrate that the FAA decision was "arbitrary and capricious," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–77, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir.1990); *Sabine River Authority v. U.S. Dept. of Interior*, 745 F.Supp. 388, 392 (E.D.Tex.1990); or, at a minimum, "unreasonable." *Sierra Club v. Lujan*, 949 F.2d 362, 368 (10th Cir.1991); *Goos v. I.C.C.*, 911 F.2d 1283, 1992 (8th Cir.1990). Since it is apparent the FAA did

not undertake a thorough independent analysis of the remedial action's environmental impact, bringing administrative expertise to bear on a factual dispute, but rather determined that its involvement constituted non-major federal action categorically excluded from the NEPA EIS requirement, the "reasonableness" standard of review would appear to be most appropriate. See *id.* As the Supreme Court noted in *Marsh,* however, "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." 490 U.S. at 377, n. 23, 109 S.Ct. at 1861, n. 23. "The reviewing Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Id.* at 378, 109 S.Ct. at 1861.

### A. Non–Major Federal Action

■ The reasoning behind the FAA decision was explained by Dean Nitz, an FAA assistant manager who is responsible for oversight of all AIP grants in the State of Michigan. He had participated in the review and approval of the subject AIP grant application. The conclusion that funding of the proposed landfill containment project constituted non-major federal action was based on recognition that the project was the subject of the Menominee County Circuit Court remedial action order, which required that a cover be installed and specified the date of completion. The FAA recognized, Mr. Nitz explained, that the order was the product of litigation prosecuted by the MDNR for the very purpose of protecting the local environment from further degradation and was issued with the consent of the MDNR.[1] Moreover, the Menominee County Circuit Court had retained jurisdiction of the parties and the project until its completion.

Thus, it appears the FAA concluded the effect of federal involvement in the project, consisting exclusively of funding, was negligible, inasmuch as timely compliance with the remedial action order, with all of its attendant effects on the environment, remedial and adverse, was mandated by the state circuit court, irrespective of the project's manner of funding. Since the fact of FAA funding would have no net effect upon the environmental impact, the award of the AIP grant was deemed by the FAA to be a non-major federal action.

Plaintiff argues the FAA may not avoid its responsibility to consider the effects on the environment which will eventually flow from completion of the project. Pointing out that a purpose of covering the landfill is to eventually provide a base for a new approach lighting system, plaintiff contends the FAA was obliged to assess the effects upon the human environment of substantially increased air traffic. Plaintiff cites *City of Atlanta v. United States,* 531 F.Supp. 506, 509–10 (N.D.Ga.1982), for the proposition that FAA installation of navigational equipment which will substantially increase air traffic is a major federal action.

The argument ignores the fact that the instant federal action is award of the AIP grant for the sole purpose of "landfill containment with associated security fence." (Def. Ex. G, Grant Agreement, p. 1). Award of the grant does not constitute approval of an airport layout or expansion plan and does not constitute a commitment to install or approve installation of the proposed lighting system. Again, the environmental effects associated with the landfill containment would occur irrespective of, and are not contributed to by, the instant federal involvement.

---

1. The MDNR's active participation in the process which resulted in the remedial action order is especially noteworthy because, as Mr. Nitz testified, even if award of the AIP grant had been deemed a major federal action, requiring at least an environmental assessment, responsibility for the assessment would have been delegated to the Environmental Protection Agency, which in turn would have delegated this responsibility to the MDNR. In other words, the task would have been entrusted to the very agency which, during the course of litigation, had already evaluated at length the environmental impacts of the proposed project and had approved the same.

Plaintiff also argues that ". . . significant federal funding turns what would otherwise be a local project into a major federal action." *State of Alaska v. Andrus,* 591 F.2d 537, 540 (9th Cir.1979). While this may be true as a matter of general proposition, the Court remains unpersuaded that it applies under the unique circumstances presented here. Not only are the primary actors state and local governments, but their actions are specifically required by court order. The Court remains unpersuaded that the funding by the FAA of remedial action which the local governmental entities are judicially compelled to undertake, irrespective of the source of funds, is sufficient, without more, to transform the project into a major federal action.

Reference to the applicable Council on Environmental Quality regulations is instructive in this regard.

"Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. Major reinforces but does not have a meaning independent of significantly.

40 C.F.R. § 1508.18. In other words, only those federal actions which significantly, or in a major way, affect the quality of the human environment are major federal actions. As indicated, award of the AIP grant, the only federal action implicated, does not alter in any way the environmental effects of the landfill containment project which must in any event go forward. The award of the AIP grant, in itself, does not significantly affect the quality of the human environment.

In view of the foregoing, the FAA's determination that its funding is a non-major federal action can hardly be characterized as "arbitrary and capricious" or "unreasonable" or "a clear error in judgment," for purposes of this motion for injunctive relief.

### B. *Categorical Exclusion*

■ The second reason given for the FAA's decision is that the landfill containment project constitutes action categorically excluded from the EIS requirement under FAA Order 5050.4A, ¶ 23a.(6): "Grading or removal of obstructions on airport property and erosion control actions with no off-airport impacts." Thus, even if award of the AIP grant were deemed a major federal action, the FAA believed it was excused from conducting an environmental assessment because the landfill containment efforts were to take place entirely on airport property and did not pose any significant environmental effect outside the airport.

Mr. Nitz testified the FAA had, during consideration of the AIP grant application, reviewed the Final Remedial Action Plan prepared by STS Consultants, Ltd. and was satisfied that no off-airport impact was threatened. Not until the engineering and excavation had begun in November 1991, was it discovered that permanent damage would be done to 0.4 acres of wetlands.

Upon discovery, the FAA did not immediately suspend funding or conduct an environmental assessment, even though FAA Order 5050.4A, ¶ 22a.(8)(d) provides that actions involving wetlands normally require an environmental assessment. Instead, the FAA ordered the Michigan Bureau of Aeronautics to investigate. The investigation revealed that the MDNR was aware of the wetlands problem and had issued a wetlands protection permit on September 30, 1991. The permit sets forth three pages of requirements with which further construction efforts must comply. (Plf. Ex. 5). Included among these is a requirement that wetland losses be mitigated through creation of a minimum of 0.4 acres of new wetlands by September 1, 1992.[2] Mr. Nitz testified the FAA was satisfied that MDNR regulatory oversight of the wetlands situation was sufficient, rendering the ultimate impact on the wetlands insignificant, and

---

2. While the permit requires creation of a minimum of 0.4 acres of wetlands, the MDNR asserts in argument that, according to the plan

being implemented, a total of 1.29 acres of wetlands will be created, resulting in a net increase in total wetlands.

rendering an environmental assessment unnecessary.

Plaintiff takes issue with this conclusion, arguing the FAA should be required to comply with its own regulations and should not be allowed to defer to the MDNR without conducting an environmental assessment.

Even apart from the question whether plaintiff has standing to assert rights vis-a-vis wetlands which bear no evident relationship to his property interests, his argument is not persuasive. Mr. Nitz testified that the FAA has no technical expertise to evaluate environmental effects in wetlands. Had the FAA insisted on an environmental assessment, he testified that the task would have been entrusted to the MDNR. See footnote 1, *supra*. Since the MDNR had already evaluated the wetlands problem and taken substantial steps to limit and remedy it through the wetlands protection permit, the FAA reasonably concluded that requiring an environmental assessment would have been a useless formality.

This approach is also consistent with the policy favoring cooperation and avoidance of duplicative efforts among governmental entities which is encouraged by the regulatory scheme. See generally, 42 U.S.C. § 4332(1)(D); 40 C.F.R. § 1500.5(b), (h) and (k).

In any event, the FAA's determination under the circumstances that the landfill containment efforts will ultimately have no significant effect on off-airport lands or wetlands cannot at this stage be characterized as arbitrary and capricious or unreasonable.[3]

In summary, the Court concludes plaintiff has failed to demonstrate a strong or even substantial likelihood of success on the merits of the claim pressed in support of his request for preliminary injunctive relief.

## IV. IRREPARABLE HARM

If FAA funds continue to be disbursed without performance of an environmental assessment and construction of the landfill cover continues, plaintiff contends he will be subject to irreparable injury. The irreparable injury identified stems essentially from plaintiff's contention that the type or design of the landfill cover which is to be installed is inadequate.

The silty sand cover to be installed is one recommended by STS Consultants, whose plan was approved after consultation and revision by the MDNR, and ultimately approved by the Menominee County Circuit Court. The evidence indicates that the sand cover was recommended and approved, even though it is somewhat more permeable than the more commonly used clay cover, for three reasons:

1. The sand cover is less expensive (STS Plan, Def. Ex. J., pp. 15, 49; testimony of William Iverson, Chief of the Geological Services Section of the Environmental Response Division of the MDNR);

2. The sand cover is less susceptible to cracking caused by freeze/thaw action, desiccation and root penetration (STS Plan, Def. Ex. J., pp. 15–17); and

3. The somewhat greater filtration permitted by the sand cover is not necessarily disadvantageous where, as here, contaminants have already been detected in the groundwater (STS Plan, Def. Ex. J., p. 15; Mr. Iverson testimony).

Plaintiff nonetheless remains of the opinion that a clay cover would be superior.[4] He

---

**3.** Testimony indicated that only approximately 0.4 acres of wetlands are threatened with permanent destruction. Reference has been made in argument to an additional 1.4 acres that will suffer temporary damage. It appears the damage referred to consists largely of displacement and disruption of wetland habitat caused by excavation incident to the landfill cover installation. This temporary physical disruption of 1.8 acres on the periphery of the subject 20 acre area may reasonably be characterized as insignificant. The Court is not oblivious to plaintiff's concerns that hazardous and/or toxic waste materials identified in the landfill area are migrating through the surface water into the adjacent wetlands. However, no substantial evidence has been presented to support the view that this process has been or will be accelerated by the containment efforts.

**4.** Plaintiff's opinion is supported by the testimony of Gerald Hagen, a chemical engineer and president of Cory Laboratories, and Robert Johnson, former Menominee City Engineer.

contends the present landfill containment design will not remediate the present contamination as effectively and that residual degradation will continue to adversely affect the groundwater at his residence, the edibility of produce from his garden, the resale value of his home, and the edibility of fish and game in the vicinity of the landfill area.

First, all of the alleged injuries are remote and speculative, and do not constitute the sort of imminent harm which would warrant preliminary injunctive relief, interfering with an environmental remediation plan approved by a state court. That such injuries are speculative and merely theoretical is established in many particulars. There is no affirmative evidence that plaintiff's groundwater or local fish and game have been adversely affected by the presence of hazardous or toxic waste materials in the landfill area. Moreover, the effect of any contamination of groundwater at plaintiff's residence is minimized by the fact that his well has been sealed and he has been provided water by the City of Menominee since 1989. In addition, Mr. Iverson testified that the purge well system, to the extent it is already operational, is working effectively to remove contaminants.

Further, the Court recognizes that the Menominee County Circuit Court's remedial action order requires the implementation, operation and maintenance of the remedial action program "until the site is successfully remediated to background for inorganics and non-detect for VOC's [volatile organic compounds]." (Order for Remedial Action dated April 21, 1989, p. 3, ¶ 3). In other words, the order requires not only construction and installation of a cover and purge well system, but also continuous operation and monitoring thereof until contamination is eradicated. The Court's order, pursuant to which the project is proceeding, thus provides substantial assurance that plaintiff will not be subject to the harms he alleges.

Neither are the alleged harms irreparable. If plaintiff *were* able to ultimately prove that the alleged harms were caused by FAA funding of the ongoing court ordered remedial action project, his remedy in damages would be adequate.[5]

Finally, it bears emphasis that the harms feared by plaintiff are not *caused* by the challenged FAA funding or even by the containment construction and installation work. They are caused by pre-existent hazardous and/or toxic waste materials in the landfill area, the very evil which the funding and remedial action themselves are committed, albeit perhaps imperfectly, to eradicate. Thus, it appears enjoining such funding and delaying the work would not prevent the alleged harms, but would at least in the short term, exacerbate them. Indeed, Mr. Iverson testified that the longer installation of the cover is delayed, the greater will be the contamination.

Plaintiff has not demonstrated a threat of imminent irreparable harm that could be

---

Both opined that generally, clay covers are superior, but neither was familiar with the instant remedial action plan or sand cover design. Their testimony is hardly compelling when viewed in conjunction with that of William Iverson. His testimony indicated that evaluation of the effectiveness and reasonableness of the landfill containment plan is not simply a matter of comparing the permeability properties of sand and clay covers. Mr. Iverson explained that the cap design must take into account the types and volumes of contaminants present and whether and where they have made contact with the groundwater. Based on such considerations, the approved design involves several localized sand caps of varying thickness which work in conjunction with an extensive system of purge wells. The purge wells which surround the landfill facilitate collection and then removal of contaminated groundwater through a newly installed sewer line to the City of Menominee for treatment. Mr. Iverson, in conjunction with other members of his staff in the Geological Services Section of the MDNR, concluded that, notwithstanding the advantages of clay, use of the proposed sand cap is reasonable and acceptable under the circumstances and in the context of the overall remedial action plan design.

5. The record indicates plaintiff has another action pending in state court for money damages against the City of Menominee for damages to his property caused by the operation of the landfill. The maintenance of this state court action further tends to refute plaintiff's contention that his injuries will be irreparable.

meaningfully prevented through the requested injunctive relief.

## V. HARM TO OTHERS AND PUBLIC INTEREST

 Since defendants in this matter are governmental entities, the effects which issuance of an injunction would have on others and on the public substantially merge. In view of the Court's foregoing conclusions concerning the likelihood of plaintiff's success on the merits and the irreparableness of anticipated harm, it is not necessary to engage in further detailed analysis. It is sufficient to note that consideration of the public interest confirms the conclusion that preliminary injunctive relief is not appropriate.

Again, the Court observes that the remedial action at issue is undeniably remedial; it is part of the solution, not part of the problem. The defendant governmental entities and the local public at large have a substantial interest in having remedial action go forward as quickly as possible. Enjoining further FAA funding pending completion of an environmental assessment by the MDNR, the very agency which has exercised primary and active supervisory control of the remedial action planning, would interpose what appears to be needless, unproductive delay. According to the testimony of Mr. Nitz, an average environmental assessment could take 9–12 months. During that period of time, if work were delayed, the threats posed to the public by contamination in the landfill of surface water and groundwater would only worsen.

At least as important as restoring the integrity of the local environment is respect for the integrity of the longstanding judicial and local governmental processes which have yielded the remedial action plan. Where state and local government, acting on behalf of the public, with continuing judicial oversight, cooperate to rectify an environmental ill, this Court is loath to intervene. Certainly the present record does not justify the requested intrusion.

## VI. CONCLUSION

Plaintiff has failed to demonstrate a substantial likelihood of success on the merits and has failed to demonstrate that he will suffer irreparable harm absent injunctive relief. Further, the interests of others and of the public in general weigh against issuance of an injunction.

Accordingly, plaintiff's motion for preliminary injunction is DENIED.

IT IS SO ORDERED.