18 F.3d 953
 305 U.S.App.D.C. 193
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
BOARD OF COUNTY COMMISSIONERS OF ADAMS COUNTY, COLORADO, et
al., Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION, et al., Respondents.
 Nos. 92-1672, 93-1138.
 United States Court of Appeals, District of Columbia Circuit.
 Feb. 22, 1994.
 
 Before: WALD, HENDERSON and RANDOLPH, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 These cases were heard on the record from the Federal Aviation Administration and on the briefs by the parties and arguments by counsel. The court has accorded the arguments full consideration and determined the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 36(b). For the reasons set out in the accompanying memorandum, it is
 
 
 2
 ORDERED that the petitions for review be denied.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 41(a)(1).
 
 MEMORANDUM
 
 4
 The petitioners seek review of a record of decision dated December 24, 1992 (ROD) in which the Federal Aviation Administration (FAA) approved a proposal by the City and County of Denver (Denver) to relocate the air cargo facilities at the new Denver airport without first requiring a supplemental environmental impact statement (EIS). We uphold the FAA's decision to approve the relocation and, accordingly, deny the petitions for review.
 
 
 5
 By decision issued September 27, 1989 the FAA approved the proposed layout for Denver's new airport, based in part on a final EIS issued the previous month. The approved layout located the air cargo facilities in the north central part of the airport. On petition for review, this court rejected challenges to both the decision and the final EIS. See Allison v. DOT, 908 F.2d 1024 (D.C.Cir.1990). Subsequently, Denver sought FAA approval to relocate the air cargo facilities several miles to the south, near the passenger terminals. By public notice dated September 1, 1992, the FAA solicited public comments on the location change (as well as other revisions not relevant here), to be submitted by September 30, 1992. On October 16, the FAA reopened the comment period until November 6, 1992. On December 24, 1992, the FAA regional administrator issued the ROD approving the cargo facilities' relocation. Although no supplemental EIS was prepared in connection with the decision, the FAA Staff did produce a "Written Reevaluation of Proposed Revisions to the New Denver Airport" (Reevaluation). The ROD "affirmed" the Reevaluation and relied on its findings in determining that "implementation of the proposed [airport layout plan] revisions will not affect the quality of the human and natural environment in a significant manner or to a significant extent not already considered in the 1989 EIS," "the conclusions of that EIS are still substantially valid," and therefore "no EIS supplementation, further environmental documentation or additional public process is required." Joint Appendix (JA) III tab 88 at 4.
 
 
 6
 The petitioners filed a complaint in the District Court for the Western District of Washington challenging the FAA's approval of the cargo facilities' relocation and subsequently filed original petitions with this court, likewise seeking review of the ROD. The Washington district court transferred its action here, having concluded it was without subject-matter jurisdiction, and the challenges were consolidated in this single action.
 
 
 7
 The petitioners challenge the FAA's approval of the facilities' relocation on what amounts to three grounds: (1) the FAA violated the National Environmental Policy Act, 42 U.S.C. Secs. 4321 et seq., by failing to order a supplemental EIS; (2) the FAA violated the Clean Air Act, 42 U.S.C. Secs. 7401 et seq., by failing to determine that the airport project would comply with existing environmental requirements; and (3) the FAA ignored its duty to ensure that the new airport is operated safely and efficiently. We address each contention in turn.
 
 
 8
 First, the petitioners claim the FAA violated its duty under section 4332(2)(C) of the National Environmental Policy Act to order a supplemental EIS.[1] "[T]he decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989). This court's review of an agency decision not to supplement an EIS "is controlled by the 'arbitrary and capricious' standard of [5 U.S.C.] Sec. 706(2)(A)." Id. at 375-76. Thus, our "inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one' "--we need consider only " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Id. at 378 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Under our narrow standard of review, we uphold the FAA's decision.
 
 
 9
 The "major federal action" of which the petitioners complained to the FAA was relocation of the air cargo facilities and, most notably, its effect on air and ground vehicle emissions. In the ROD, however, the FAA, relying on its Staff's Reevaluation, determined that "implementation of the proposed ALP revisions will not affect the quality of the human and natural environment in a significant manner or to a significant extent not already considered in the 1989 EIS." Further, the Reevaluation, which the ROD expressly adopted, addressed the impact of the relocation on both air and ground vehicle emissions. Regarding the former, it analyzed the potential effect on taxiing distances and concluded that "because aircraft operators prefer reduced taxi distances, therefore they will request arrivals and departures as close to the southern cargo facility as possible," resulting in a net decrease in taxiing distance and, consequently, in the amount of aircraft emissions. JA III tab 88 app. D at 4. As for ground vehicles, the Reevaluation concluded that relocation would also decrease the amount of emissions, because cargo carrier vehicles would travel shorter distances, and would not have any significant capacity-related impact. Id. at 2-3. While the petitioners offer contrary opinions regarding the relocation's effects, "[t]he question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise," Marsh, 490 U.S. at 376, and we must therefore accept the FAA's informed and reasonable determinations. See id. at 377 ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.' ") (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976)); id. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). Because the FAA considered the relevant factors and its determination of no serious adverse environmental impact was not a "clear error of judgment," we uphold the ROD's consequent decision that a supplemental EIS was unnecessary.[2]
 
 
 10
 Next, the petitioners claim the FAA violated section 7506(c) of the Clean Air Act by failing to ensure that airport construction comply with existing environmental standards. We reject this argument as well. Section 7506(c) provides that no federal entity may "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." The section further provides that "assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality" and defines such "conformity" to mean
 
 
 11
 (A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and
 
 
 12
 (B) that such activities will not--
 
 
 13
 (i) cause or contribute to any new violation of any standard in any area;
 
 
 14
 (ii) increase the frequency or severity of any existing violation of any standard in any area; or
 
 
 15
 (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.
 
 
 16
 42 U.S.C. Sec. 7506(c)(1); see also id. Sec. 7506(c)(3) (governing conformity determination in absence of approved state implementation plan). The petitioners have failed to cite any specific "nonconformity," that is, any way in which the relocation causes or exacerbates the violation of any particular environmental standards. Upon initial evaluation in 1989, the FAA found the airport was "conforming" under subsection 7506(c), relying in part on the conditional nature of Denver's grant approval which imposed on Denver a "continuing duty ... to assure that the project meets its mitigation responsibilities contained in any approved State Implementation Plan (SIP) and subsequent amendments thereto in accomplishing project construction and in operating the airport." JA I tab 13 at 5.33. There is no reason to believe the cargo facilities' relocation has changed the project's conforming status. Both the ROD and the Reevaluation expressly concluded relocation would in fact cause a reduction in vehicle emissions. While it is true, as the petitioners point out, that emissions will be concentrated in a smaller area, they have not demonstrated that this slightly higher concentration is environmentally significant or will violate any particular standard. In the event such a nonconformity is ever established, it can be addressed through Denver's continuing duty to mitigate.[3]
 
 
 17
 Finally, the petitioners assert the relocation will result in "unsafe and inefficient airport operations," based on their theory of increased taxiing distances and their belief that some buildings may obstruct vision or interfere with a radar system that has not yet been, and may never be, installed. We must reject this argument as well. As we have already noted, we are constrained to accept the FAA's factual determination that taxiing distances will decrease. The petitioners' remaining predictions of what may occur are speculative at best. We again note that any problem with building size or location can be remedied when identified, as apparently is already being done. See Petitioners' Opening Brief at 488 (noting that "FAA announced that it must alter a firehouse because it shadows a runway").
 
 
 
 [1]
 This section requires that
 all agencies of the Federal Government shall--
 * * *
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 42 U.S.C. Sec. 4332(2)(C).
 
 
 [2]
 To the extent the FAA may have been required to prepare an "Environmental Assessment" (EA) in lieu of a supplemental EIS, the discussions in the ROD and the Reevaluation satisfy that duty, see 40 C.F.R. Sec. 1508.9(b) (An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.")
 
 
 [3]
 The petitioners do assert the FAA failed to ensure the airport obtained state-required emission permits before beginning construction and operation of stationary emission sources. They concede, however, that that omission has been remedied and the appropriate permits obtained. See Petitioners' Opening Brief at 38; see also Intervenors' Brief Tab 3