**IDAHO SPORTING CONGRESS, INC., Plaintiff,**

v.

**U.S. FOREST SERVICE, Defendant,**

and

**Intermountain Forest Industry Assn., Intervenor.**

Civ. No. 96–0025–S–BLW.

United States District Court, D. Idaho.

Sept. 25, 1996.

D. Bernard Zaleha, Boise, ID, Thomas J. Woodbury, Marc D. Fink, Idaho Sporting Congress, Boise, ID, for Idaho Sporting Congress Inc.

D Marc Haws, AUSA, U.S. Attorney's Office, Boise, ID, David W Gehlert, U.S. Dept of Justice, Environmental Enforcement Section, Denver, CO, for Forest Service, US.

Bruce M. Smith, Patrick D. Madigan, Rosholt Robertson & Tucker, Boise, ID, for Intermountain Forest Industry Association.

## MEMORANDUM DECISION

WINMILL, District Judge.

### INTRODUCTION

The Court has before it cross-motions for partial summary judgment. In addition, the Government has filed a motion for summary judgment on jurisdictional grounds. The motions were fully briefed, and the Court heard oral argument on September 23, 1996. The motions are now at issue.

### SUMMARY OF ACTION

The Plaintiff, Idaho Sporting Congress, Inc. (ISC), contends in this action that the Government has failed to follow environmental laws in managing the four National Forests within Idaho's borders. More specifically, ISC asserts that the Government has failed to prepare a supplemental environmental impact statement (SEIS) addressing the changes to Idaho's National Forests caused by the wildfires of 1994. The ISC seeks an injunction preventing the Government from harvesting trees or taking other significant actions until the SEIS has been prepared.

In its motion for partial summary judgment, the ISC narrows its attack to focus on enjoining certain harvesting activities in two of the four National Forests. ISC's motion seeks to enjoin the Government in the Boise and Payette National Forests from (1) going forward with any green timber sales; (2) reclassifying green sales as salvage sales outside the burned areas; and (3) going forward with any sale that has already been so reclassified,[1] until the Government has prepared an SEIS.

---

1. ISC is barred from using federal environmental laws to challenge salvage sales. *Idaho Sporting Congress v. U.S. Forest Service,* 92 F.3d 922 (9th Cir.1996). ISC mooted any controversy over this claim by conceding at oral argument that it was

## BACKGROUND FACTS

In 1994, lightening-caused fires burned about 7% of the Boise National Forest (BNF) and about 13% of the Payette National Forest (PNF). Shortly after those fires were contained, scientists from the two Forests joined forces to form a Broadscale Analysis Team (BAT). The BAT studied the fire's impact on an area encompassing over a million acres.

The BAT's studies culminated in two reports. The first report, filed in January of 1995, was an internal document entitled Summary of Findings Relative to the Forest Plan and Recommendations. True to its title, the report gave a summary of the BAT's findings on the fires' effects, and recommended amendments to the PNF Land Resource Management Plan (LRMP), the long-term plan governing the operation of the PNF.

The second report—called the Broadscale Assessment for Post–Fire Landscapes—was released to the public in May of 1995. The stated purpose of this report was to "[u]se the [LRMP] as a starting point, but make adjustments for changes that have occurred since the [LRMP] was approved." See, Broadscale Assessment at p. 1–4. The report explains that the PNF "decided to use the fires as an opportunity to take the first step toward implementing ecosystem management." Id.

In the PNF, a landscape assessment team (LAT) studied 200,000 acres of the burned area in the Elkhorn, French, Fall, and Carey Creek drainages. The LAT issued a report that became the basis for the Main Salmon Post–Fire Project which proposed that salvage logging remove the fire-killed and dead trees in the area. The PNF then prepared a draft environmental impact statement (DEIS) for the Main Salmon River Post–Fire Project. That DEIS proposed 6 alternatives. The PNF Forest Supervisor chose an alternative that, according to the DEIS, met the

PNF LRMP standards—or required only non-significant amendments to the LRMP—for water quality, fish and wildlife habitat, soil, timber, vegetation, and range.

In August, 1996, the BNF issued a Forest Plan Five–Year Monitoring and Evaluation Report. The Report was designed to evaluate the changes caused by the 1994 fires, among other factors, and to recommend any necessary changes to the BNF LRMP. The Report prepared by an interdisciplinary team of BNF scientists—concluded that "[a]lthough the need to change Forest Plan direction is not a crisis, the team believes the need is substantial and compelling enough to warrant change before the year 2004." See, Monitoring Report at p. 5. For example, the Report concluded that the threats to management indicator species[2] caused by destruction of habitat in the 1994 fires were not serious enough to require action prior to the amendment of the LRMP. See, Monitoring Report at pp. 19–21. The Report reached the same conclusion with regard to the habitat needs of nineteen additional species known as "sensitive species."[3]

On the basis of this Report, the BNF Forest Supervisor concluded that a revised LRMP—with its accompanying EIS—was needed by the year 2000. With regard to taking any action prior to that time, the Supervisor stated that "[t]he need for change is compelling, but not urgent enough in the short-term to warrant changing Forest Plan direction before the planned revision is completed in the year 2000." See, Monitoring Report, Forest Supervisor's Response at p. 1.

The PNF also issued a Monitoring Report which identified the changes in the LRMP required by the 1994 fires. The Report concluded that a revised LRMP was necessary for a number of reasons. Prominent among that list of reasons was a settlement of litigation entered into by the Government requir-

---

not attempting in this lawsuit to enjoin salvage sales.

**2.** These are species whose population changes reflect the effects of management activities. They include the yellow warbler, meadow vole, elk, mule deer, mountain chickadee, pileated woodpecker, and red-backed vole. See, Monitoring Report at p. 19.

**3.** There are 19 sensitive species including the great horned owl, spotted frog, westslope cutthroat trout, bull trout, steelhead trout, lynx, and wolverine, among others. See, Monitoring Report at p. 22–23.

ing the preparation of a revised LRMP by the year 2000. The Monitoring Report also noted that the changes caused by the 1994 fires, among other factors, required a revised LRMP. Although the PNF Monitoring Report did not expressly address the need to take action prior to the year 2000 as the BNF Monitoring Report did, the PNF report did not contain any recommendation for action prior to the year 2000.[4]

## LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence must be viewed in the light most favorable to the non-moving party, *Id.* at 255, 106 S.Ct. 2505, and the Court must not make credibility determinations. *Id.* The trial judge must determine whether the evidence presented is such that a jury applying the proper evidentiary standard could reasonably find for either the Plaintiff or the Defendant. *Id.*

However, once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256–57, 106 S.Ct. 2505. In meeting this burden, the non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## JURISDICTIONAL ISSUES

The Government has filed a motion for summary judgment raising several jurisdictional arguments. The Court finds, however, that these issues have been litigated in this Circuit and decided against the Government. *Portland Audubon Soc. v. Babbitt*, 998 F.2d 705 (9th Cir.1993). The Court will therefore deny the Government's motion for summary judgment on jurisdictional grounds.

## LEGAL FRAMEWORK

■ The National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, "envisions a two-stage approach to forest planning." *Inland Empire Public Lands v. U.S. Forest Service*, 88 F.3d 754, 757 (9th Cir. 1996). In the first stage, a LRMP is developed for a particular National Forest. The LRMP establishes forest-wide and area-specific standards and guidelines to which all projects within that National Forest must adhere for up to 15 years. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1052 (9th Cir.1994). The standards and guidelines contained in the LRMP must balance outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish, 16 U.S.C. § 1604(g)(3)(A), and provide for diversity of plant and animal communities, 16 U.S.C. § 1604(g)(3)(B), among other objectives.

■ The NFMA requires that the LRMP comply with the NEPA. *Inland Empire*, 88 F.3d at 757. This means that the LRMP must be accompanied by an environmental impact statement (EIS).

■ The second stage envisioned by NFMA occurs when an individual site-specific project is proposed. *Id.* "These site-specific projects must be consistent with the stage-one, forest-wide [LRMP]." *Id.*

In the present case, the PNF and BNF LRMPs, with their related EISs, were approved in 1988 and 1990, respectively. If there is a significant change in the environment of the National Forest, the regulations promulgated under the NFMA give the Forest Supervisor the authority to revise the LRMP. 36 C.F.R. § 219.10(f). More precisely, the Forest Supervisor may decide to revise the LRMP if he or she determines that "conditions or demands in the area covered by the [LRMP] have changed significantly." *Id.* at § 219.10(g). The regulations also provide that the LRMP "shall ordinarily be re-

---

4. The PNF has joined with the BNF and the Sawtooth National Forest to form a group called the Southwest Idaho Ecogroup. The Ecogroup will ignore artificial man-made boundaries to develop LRMPs that recognize ecological processes across broad areas.

vised on a 10–year cycle or at least every 15 years." *Id.*

A revision is "not effective until considered and approved in accordance with the requirements for the development and approval of a forest plan." *Id.* In other words, the revised LRMP will not be approved unless it passes the rigorous requirements of 36 C.F.R. § 219.10(b) which include the preparation of a written revised plan supported by a new EIS; full public review with an opportunity for public comment over a 3 month period; and approval by the Regional Forester.

Both the BNF and PNF decided to prepare new EISs and revised LRMPs by the year 2000. The BNF and PNF Forest Supervisors found that significant changes in the environments of their National Forests compelled the revisions to the LRMPs. *See, BNF Monitoring Report at p. 4* ("The [Interdisciplinary] team recommends that a revision of the Forest Plan be initiated, because conditions have changed significantly over the past five years....."); *Idaho Conservation League v. Thomas,* 91 F.3d 1345, 1347 (9th Cir.1996) ("According to the Forest Service, the magnitude and extent of the wildfires experienced in the summer of 1994 were significantly greater than what they had anticipated.")

ISC seizes on these findings of significant change to argue that they compel not only revision of the LRMPs but also immediate preparation of SEISs. ISC asserts that once a finding of significant change has been made, the Government loses any discretion in the matter and is required to immediately prepare the SEIS. ISC seeks to halt all activities such as green timber sales until the SEISs are prepared.

■■■ The general rule under NEPA is that an EIS "shall" be supplemented whenever there are "significant new circumstances or information relevant to environmental concerns...." 40 C.F.R. § 1502.9(c)(1)(ii). But an agency

> need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.

> On the other hand ... NEPA does require that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. Application of the "rule of reason" thus turns on the value of the new information to the still pending decision making process.

*Marsh v. Oregon Nat. Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■■■ This Court reviews an agency's decision not to supplement an EIS under the "arbitrary and capricious" standard of the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). The inquiry must be "searching and careful," but "the ultimate standard of review is a narrow one." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. The Supreme Court in *Marsh* went on to set out the standard of review in more detail:

> When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

In *Marsh,* the Army Corps of Engineers prepared an EIS for a dam on the Rogue River in Oregon. Sometime later, the Corps received two reports concluding that the dam would harm fish and ruin water quality. The first report from biologists at the Oregon Department of Fish and Wildlife (ODFW) concluded that the dam would warm the river water, causing a decreased survival of spring chinook "from by 60–80%." The second report, prepared by scientists from the United States Soil Conservation Service (USCS), concluded that the dam would cause soil disturbances resulting in increased turbidity beyond that estimated in the original EIS.

The Corps issued a Supplemental Information Report (SIR) addressing directly the ODFW report and indirectly the USCS report. In the SIR, the Corps found that the water temperature forecasting model used by the ODFW could produce inaccurate results; that the Corps own measurements indicated that the ODFW's fears of warming were exaggerated; and that the ODFW failed to take into account the beneficial effects of the dam on fish spawning. While the SIR did not expressly comment on the USCS study, it did refer to two other studies and concluded that the turbidity predictions had not changed since the original EIS.

This response by the Corps was deemed by the Supreme Court in *Marsh* to constitute the requisite "hard look." The Court stated that

> "the Corps had a duty to take a hard look at the proffered evidence. However, having done so and having determined based on careful scientific analysis that the new information was of exaggerated importance, the Corps acted within the dictates of NEPA in concluding that supplementation was unnecessary. Even if another decision maker might have reached a contrary result, it was surely not 'a clear error of judgment' for the Corps to have found that the new and accurate information contained in the documents was not significant and that the significant information was not new and accurate."

*Marsh*, 490 U.S. at 384, 109 S.Ct. 1851.

In the present case, ISC contends that the 1994 fires caused significant changes in the BNF and PNF requiring SEISs. ISC claims that the significant changes include the following: (1) "There has been significant impairment to soil and water resources .... creating a much more erosive, unstable situation that threatens the continued integrity of fisheries," *See, ISC's Brief at p. 12;* (2) "The loss of significant habitat area, especially for bull trout and probably for elk as well, indicates a pressing need to reconsider habitat capability under the [LRMP]," *Id. at 13;* (3) The fires have impaired soil productivity and watershed conditions requiring a recalculation of the amount of lands deemed suitable for timber management, *Id. at 14;* (4) The Government must "take a broader look at the increased sediment yields in unburned areas downstream from fire-damaged basins, and in the forest as a whole ....," *Id. at 15;* and (5) the increased amount of timber removed in salvage sales is not being taken into account, *Id at 15.*

ISC asserts that "[i]t is simply irresponsible for the [Government] to ignore these changed circumstances...." *See, ISC's Brief at p. 12.* Is the ISC correct? Did the numerous Government studies overlook these crucial changes? Or did the National Forest officials misread the studies? For answers, the Court turns to the thick stack of studies relied upon by the Government.

Examining first ISC's claim that the Government ignored the impact of the fires on soil and water resources, the Court finds in the BAT's Summary of Findings a conclusion that the 1994 fires eliminated much of the woody debris on the forest floor, threatening soil productivity, water quality, and wildlife habitat. The report recommended improved guidelines that the Government immediately adopted in the document entitled Snag and Coarse Woody Debris Guidelines. The express purpose of those guidelines is to improve soil productivity and wildlife, habitat, and to promote forest regeneration. *See, Snag and Coarse Woody Debris Guidelines at p. 1.* The other BAT report, the Broadscale Assessment, concluded that the 1994 fires had "no long-term adverse impacts to soil productivity ... or hydrologic function." *See, Broadscale Assessment at p. 3–14.* These studies do not support ISC's claim of Government ignorance.

The ISC also accuses the Government of ignoring the impact of the fires on management indicator species and sensitive species. Turning once again to the Government studies to evaluate this claim, the Court finds that the Broadscale Assessment concluded that "[t]he fires are not expected to impair the viability of sensitive fish species, nor are the fires expected to adversely affect listed species or critical habitat because only minor deviation from Forest Plan standards occurred...." *See, Broadscale Assessment at p. 3–21.* The BNF Monitoring Report specifically found that the 1994 fires had no adverse effect on the elk and bull trout populations that required immediate action prior to the scheduled revision of LRMPs by the

year 2000. *See, BNF Monitoring Report at pp. 20–23.* The Broadscale Assessment found that the 1994 fires in the PNF "were very similar to those ... in the Frank Church River of No Return Wilderness which have been determined by the Forest Service to be 'not likely to adversely effect' chinook salmon or critical habitat." *See Broadscale Assessment at p. 3–19.* The Broadscale Assessment also concluded that the 1994 fires had "no long-term adverse impacts to ... fisheries...." *See Broadscale Assessment at p. 3–14.*

While the studies reported above basically conclude that no short-term Forest management changes were needed, the studies did find that long-term amendments to the LRMPs were needed. The BAT Summary of Findings is filled with proposed amendments to the LRMPs.

The Government's studies conclusively establish that the Government has not ignored the impact of the 1994 fires. Neither did the Government misinterpret those studies in concluding that the most immediate need was to revise the LRMPs by the year 2000. ISC has not pointed the Court to any recommendation in the studies advocating action prior to the year 2000 that was ignored by the Government. Indeed, the Court's review of the studies indicates that no such immediate management changes are necessary.

■ ISC claims that the "fundamental legal issue before this Court ... [is] whether or not the '94 wildfires represent significant changed circumstances relevant to environmental concerns with the ongoing implementation of the [LRMPs]." *See, ISC's Reply Brief at p. 2.* The ISC would be correct if the Court was engaging in a *de novo* review. But that is not the standard. Instead, *Marsh* counsels this Court to restrict its analysis to determining whether the Government has taken a "hard look" at the environmental effects of the 1994 fires, and made a reasoned decision to not prepare SEISs. The Government reports and studies discussed above show conclusively that the Government has taken the required "hard look." And the studies support the Government's decision to wait until the year 2000 to prepare LRMPs and EISs.

The Ninth Circuit faced a similar situation in *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.,* 42 F.3d 517 (9th Cir.1994). There, the Plaintiff alleged that the Government failed to properly prepare an SEIS on the impacts of 1993 wildfires in the Laguna area of California. But the Circuit held that the Government did take "the requisite hard look" because it had examined numerous reports studying the effect of the fire on wildlife, water quality, and soil, and reached a reasoned decision based on that evaluation. *Id.* at 529.

■ ISC asserts, however, that once the Government makes a finding of significant change, it loses all discretion over whether to prepare a SEIS. More specifically, ISC asserts that because the Government made a finding of significant change under the LRMP regulations, that finding carries over to the EIS regulations and applies with equal force to compel the preparation of a SEIS.

It is true that the LRMP regulations and the EIS regulations—although found in different sections of the CFRs—contain similar "trigger" provisions. Both are put into play by findings of significant change. In this case, the BNF and PNF found significant changes in the Forests' environments that compelled the revision of the LRMPs by the year 2000. There was no finding that the significant change required any interim or more immediate action.

The findings of significant change came attached with both a time and a content component: the changes were not significant enough to require any revisions prior to the year 2000, and the findings were made under the LRMP regulations, not the EIS regulations. ISC wants this Court to take the findings out of context, to ignore the time and content components attached to the findings. The Court cannot, however, ignore some portion of an agency's findings, while taking the remaining portion out of context.

ISC does not challenge the placing of a time component on the LRMP revisions. That is, ISC does not challenge the BNF's implicit finding that the changes were not significant enough to require LRMP revisions prior to the year 2000.[5] There is noth-

5. Obviously, the PNF's revision date was set in    the litigation settlement documents. The Court

ing in the LRMP regulations that expressly authorize the BNF to set the LRMP completion date for the year 2000 as opposed to a more immediate date, like 1998. Nevertheless, this regulatory silence is construed as implicit consent. Given the similarity between the LRMP and SEIS regulations, there is no principled reason to treat them differently.

ISC claims that the regulations do not account for degrees of significance. That is, the regulations do not permit the agency to make a finding that the changes were "significant enough" for a future revision but not "significant enough" for an immediate revision. In fact, however, the NEPA regulations do provide that "[s]ignificance varies with the setting of the proposed action." 40 C.F.R. § 1508.27. These regulations go on to define "significance" by the "degree to which" the changes affect public health, the environment, and wildlife, among other subjects. *Id.* at § 1508.27(b). Thus, the significance of change does in fact vary with the context, and can have varying degrees of intensity. ISC's assertion that the term "significance" is rigid and one-dimensional finds no support under the NEPA regulations.

Finally, ISC complains of a "closed loop" where the Government relies only on its own studies and not on any outside expertise. But the ISC ignores the Government's release of many of the studies discussed above to the public—the record shows that the Government's analysis did not occur behind closed doors. And *Marsh* specifically held that "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851.

## CONCLUSION

The Court is satisfied that the Government has taken a hard look at the effects of the 1994 fires on the PNF and BNF. The Government has decided to revise the PNF and BNF LRMPs—and issue new EISs—by the year 2000. After reviewing the lengthy record, the Court is satisfied that the Government's decision is reasoned, and that no sup-

addresses here only the BNF's example.

plemental EIS is necessary. The Court will therefore grant the Government's motion for partial summary judgment and deny ISC's motion for partial summary judgment. As previously discussed, the court will also deny the Government's motion for summary judgment on jurisdictional grounds.