EBEL, Circuit Judge,
dissenting.
For over a century, humans have suppressed fires and other natural, destructive forces in the Norbeck Wildlife Preserve. See Aplee. Supp.App. at 44. As a result of this artificial, human interference, the Preserve has been transformed from a wilderness area with a variety of habitats and wildlife to a place dominated by mature- to old-growth ponderosa pine. See id. Whereas before, an abundant diversity of aspen,' spruce, and pine flourished amidst meadows, streams, and rock formations, now the Preserve harbors a monoculture of older ponderosa pine. See id. at 47 (“Ponderosa pine is the dominant species in Norbeck Wildlife Preserve, constituting 92 percent of habitat. [In 1992,] 82 percent of the ponderosa pine in Norbeck [was] in a mature condition.”); id. at 21 (“National Forest land in Norbeck lacks habitat diversity. The dominant vegetative type is mature ponderosa pine growing in dense, homogenous stands of 150 acres or more. There is little diversity in either tree species or the ages and sizes of the existing trees.”). Prior to human interference, seedlings, saplings, and mature trees of various species provided a tapestry of canopies which in turn allowed for an assortment of different plants and shrubs to grow beneath the trees. See id. at 44. The unbroken, closed, single-level canopy of mature ponderosa pine forests blocks sunlight and is steadily choking off the grasses, flowers, and bushes which *1290 used to grow on the forest floor of Nor-beek. See id.
The natural diversity of plants, shrubs, and trees supported a diversity of wildlife. As the majority acknowledges, different wildlife species require different, often conflicting types of habitat: “[S]ome species are sustained by mature to old-growth timber stands, while others need early suc-eessional forest stages.” Maj. op. at 1284. Compare Aplee. Supp.App. at 25 (stating that elk and deer need open areas and young pine stands) with id. at 53 (indicating that northern goshawks and northern three-toed woodpeckers need older tree stands). Consequently, the decades of artificial suppression of the natural growth and decay in Norbeck have transformed it from a wilderness that used to support an abundant variety of animals, birds, and fish to a place suited to the few species that can survive in mature- to 'old-growth ponderosa pine forests.[1]
Modern forest management science has recognized that humans can alter the delicate balance of an area like Norbeck both by cutting all the trees, turning a diverse wilderness into a meadow, and by suppressing all the fires or vegetative diseases, turning a wilderness into an unbroken forest. Here, the Forest Service, employing this modern understanding, is attempting to restore wildlife diversity to the Preserve by restoring habitat diversity.
As laudable as this goal may be, the majority is correct to insist that the Forest Service’s decisions with regard to the Needles and Grizzly areas must comply with the Norbeck Act.[2] The ■ majority disapproves of these decisions because it believes that the Forest Service has failed to develop an adequate record to show that the Norbeck Act’s mandate to protect game animals and birds has been satisfied. See 'maj. op. at 1289. The majority’s two overriding concerns are that (1) the Forest Service subordinated the Norbeck Act to the NFMA, see maj. op. at 1289, and (2) the proposed plans “patently contradict” the Norbeck Act’s mandate, see id. at 1288 n. 5.
I do not share the majority’s concerns. I respectfully dissent because I believe the Forest Service has demonstrated compliance with all the statutes that apply, including the NEPA, the NFMA, and the Norbeck Act. Unlike the majority, I find the Act rife with ambiguity and the Forest Service’s decisions reasonable interpretations of it. Therefore, I believe Chevron deference requires us to affirm the district court’s approval of these decisions.
A. Overlapping Statutes
The Norbeck Preserve is governed by several overlapping statutes, e.g., the NEPA, the NFMA, and the Norbeck Act, each of which must be complied with before any decision affecting the Preserve may be implemented legally.[3] At times *1291 the majority acknowledges this. See maj. op. at 1287 (stating that the NEPA applies to Norbeck); id. at 1287 (same for the NFMA); id. at 1287-88 (holding that management plans must comply with the specific mandate of the Norbeck Act). At other times, however, the majority seems to set up an “either-or” proposition: Either the NFMA or the Norbeck Act applies, but if the former does then the latter cannot. See maj. op. at 1286 (discussing “which among various statutes” govern agency action); id. at 1286 (disagreeing with the Forest Service’s assertion that its decisions comply with all the overlapping statutes, including the Norbeck Act, and chiding the Service for “not rely[ing] solely on the Norbeck Act”); id. at 1287 (asking whether the NFMA can “overbalance and thereby effectively negate” the Norbeck Act). I believe this is a false dichotomy. There is no inherent reason to think that the Forest Service’s reliance on the NFMA necessarily violates the Norbeck Act.
These instances of characterizing the case in “either-or” terms brings to light the majority’s fundamental concern, and the question at the heart of this case: whether the Forest Service’s goal of “op-timiz[ing] overall wildlife, fish, and vegetative habitat diversity,” maj. op. at 1285 (citing the NFMA), is permissible given the Norbeck Act’s mandate of preserving Norbeck “for the protection of game animals and birds, and ... as a breeding place therefor,” id. (quoting the Norbeck Act, 16 U.S.C. § 675). The majority concludes that the goal is “patently contradictory” to the Act’s mandate. See maj. op. at 1288 n. 5. I disagree given the Act’s ambiguity.
B. Ambiguities in the Norbeck Act
I agree with the majority’s conclusion that, as the most specific of the overlapping statutes that apply to the Preserve, the proposed management plans must comply with the “specific mandate” of the Norbeck Act. See maj. op. at 1287. I disagree, though, with the majority’s further conclusion that the Act’s language “eontain[s] and limit[s]” the Forest Service’s discretion in such a way as to disallow the proposed plans for Norbeck. See id. at 1288 n. 5. My reason, again, is that I find the Act ambiguous on numerous levels. The surrounding statutory context eliminates some of the ambiguity, but it does so in favor of the Forest Service’s interpretation.
To begin with, “protection of game animals and birds” is ambiguous in that it may mean either protecting individual animals[4] or protecting populations of animals.[5] The latter reading seems more plausible because § 676 permits the Secretary of Agriculture to issue regulations to govern “hunting, trapping, killing, or capturing of game animals and birds” on the Preserve. See 16 U.S.C. § 676. Indeed, protecting populations of animals may in fact require injuring or killing individual animals. For example, the Forest Service would “protect” a herd of deer living in the Preserve if it killed one, sick member of that herd before it was able to spread a contagious disease to the others.
Second, the ambiguity the majority notes in the term “protection,” see maj. op. at 1288, is drained of some of its ambigu-ousness — but, again, in favor of the Forest Service’s plans to allow logging — by § 678a, which, as the majority mentions, expressly permits timber harvests in limit *1292 ed situations, see maj. op. at 1285. Thus, the term “protection” must permit some harm to some animals, ie. it allows some amount of “wildlife disturbances” and “deleterious effects on certain species.” See maj. op. at 1287-88. How much harm is too much is a judgment call best left to wildlife experts, not this court. See Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (explaining that courts “must defer to the informed discretion of the responsible federal agencies” on questions requiring “a high level of technical expertise”). These experts — from the Forest Service and the broader scientific community — participated in the notice-and-comment process leading up to the adoption of the management plans at issue. See infra at 1288.
Consequently, the phrase “the protection of game animals and birds” is best read as directed at game animal and bird populations, not at individual animals or birds, and as permitting, not forbidding, some wildlife disturbances.
The third, and most telling, ambiguity of § 675’s phrase “protection of game animals and birds,” however, resides in the object of protection, i.e., in discerning what exactly is to be protected. If the phrase “game animals and birds” means “game animals and game birds,” then the Forest Service’s goal of achieving the “greatest overall benefit to wildlife” could be in tension with the limitation imposed by the Act, because non-game bird species may benefit at the expense of game birds.[6] In contrast, the tension created by “game birds” is reduced if we read “game animals and birds”[7] to mean “game animals and game and non-game birds.” Seeking the greatest good for all bird species in the Preserve is entirely consistent with this latter reading.
Another ambiguity in the object of protection comes to light when one considers that to remain viable, different species require different, often conflicting types of habitat. See maj. op. at 1284 (“Successful management necessitates a precarious balancing of the environmental impacts occasioned by geographical features such as meadows, undergrowth, timber stands, roads, and waterflow. For example, some species are sustained by mature to old-growth timber stands, while others need early successional forest stages.”). While the Norbeck Act mandates “protection of game animals and birds,” it does not specify which species are to be preferred over which others when conflicts in habitat occur, as they inevitably will. For example, if the Forest Service refuses to thin a mature forest on the ground that it must “protect” the three-toed woodpecker and northern goshawk, then it is, by its inaction, detrimentally affecting white-tailed deer, elk, ruffed grouse, and mountain goats who benefit from more meadows and edges for foraging. See Aplee. SuppApp. at 53. While the Forest Service’s experts, after consulting with others, concluded that the proposed plans will maximize the benefit to all species in Norbeck, see id. at 24 (chart comparing optimum habitat for various species); id. at 37 (“Optimum habitat capability will be achieved for pygmy nuthatch, goshawk, and northern three-toed woodpecker by all [management] alternatives.”), the majority’s decision reinstates the status quo, which benefits only *1293 species which can survive in old-growth ponderosa pine forests.
I find it surprising that the majority expressly rejects as unambiguous the object of protection under the Act. See maj. op. at 1288 (holding that “the ambiguity [in the Act] does not extend to the object of protection”). It is particularly surprising because in a footnote immediately after this rejection, the majority acknowledges several of the ambiguities I just identified.[8] The majority attempts to overlook these ambiguities by arguing that “because the agency justified its plans pursuant to broader NFMA principles, it did not address those specific interpretive questions and we leave them for the agency to address in the first instance.” Maj. op. at 1288 n. 5.
The majority fails to persuade me with this argument for two reasons. First, despite the majority’s characterization, the Forest Service did not ignore the Norbeck Act or argue that the NFMA’s goal legitimately “overbalanced” the Act. Rather, it contended that its decisions fully complied with the Act given its ambiguity. See maj. op. at 1286 (citing the Forest Service’s brief); see also Forest Service brief at 27-28 (summarizing its Chevron argument); Aplts. App. at 49, 55 (justifying Needles decision using the Act); id. at 65, 70 (same for Grizzly decision). Thus, the Forest Service did not “justify its plans pursuant to broader NFMA principles,” but argued its plans were justified based on the application of all the applicable statutes, including the Norbeck Act. Second, the majority’s reasoning here strikes me as another attempt to rely on a false “either-or” dichotomy. So long as the Forest Service’s decisions are consistent with every statute that applies, we need not be concerned that the Forest Service adopted the “overall wildlife diversity” goal from the NFMA, that it did not rely solely on the Norbeck Act, or that it relied more heavily on the NFMA.
Given the past one hundred years of artificial, human fire suppression, the Preserve now provides an overabundance of habitat for some “game animals and birds” but for others it is becoming an unsuitable place for shelter, feeding, and breeding. See Aplee. SuppApp. at 25. It seems to me that the Act’s flat mandate “to protect game animals and birds and provide a breeding place therefor” is best fulfilled by the Forest Service’s goal of providing “optimum habitat diversity” so that the greatest good comes to the greatest number of species populations. Ultimately, of course, what interpretation I (or the majority) think best fulfills the Act does not matter. Chevron requires a court to defer to agency interpretations unless “manifestly contrary to the statute.” United States v. Mead Corp., 533 U.S.-, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001). Thus, the final question I must address is whether Chevron applies.
C. Chevron or Skidmore Deference
In order to determine how much deference we give to the Forest Service’s decisions to permit timber harvesting in the Needles and Grizzly areas, we must look to the Supreme Court’s recent pronouncement in Mead Corp. There, the Court teaches that courts give agency interpretations Chevron deference if “Congress delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference was promulgated in the exercise of *1294 that authority.” Mead Corp., 121 S.Ct. at 2171; see also Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If an interpretation does not qualify for Chevron deference, then we still must consider whether it merits some amount of deference under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See Mead Corp., 121 S.Ct. at 2175.[9]
In this case, both the Black Hills National Forest Land and Resource Master Plan of 1983 (“the Black Hills LRMP”) and the Needles and Grizzly decisions are entitled to Chevron deference. As the majority correctly noted, the NFMA is the “substantive statute under which the Forest Service is acting.” Maj. op. at 1287; see also Appellees Opening Brief at 31 (agreeing that “Norbeck, as part of the National Forest System, is governed by multiple management statutes, including NFMA”). When it enacted the NFMA, Congress authorized and instructed the Secretary of Agriculture to “develop ... land and resource management plans for units of the National Forest System,” 16 U.S.C. § 1604(a).
Regulations passed pursuant to the NFMA establish a two-stage approach to forest planning. See Inland Empire Pub. Lands v. United States Forest Serv., 88 F.3d 754, 757 (9th Cir.1996); see also 36 C.F.R. § 219.10 (2000). In the first stage, the Forest Service develops a proposed land and resource management plan (“LRMP”), together with a draft and final environmental impact statement (“EIS”). See Inland Empire, 88 F.3d at 757; see also 36 C.F.R. § 219.10(a) & (b) (2000). In this case, the Black Hills LRMP is the fruit of the first stage of the process. See Aplee. SuppApp. at 9-16 (“1983 Forest Plan”). “Once the LRMP is approved, direct implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed. These site-specific projects must be consistent with the stage-one, forest-wide plan.” Inland Empire, 88 F.3d at 757 (citations and alterations omitted); see also 36 C.F.R. § 219.10(e) (2000) (“Plan Implementation”). The Needles and Grizzly decisions are site-specific projects that occurred as part of stage two. See Aplts. App. at 49-64 (“Needles Decision Notice”) and 65-75 (“Grizzly Decision Notice”). As required by NFMA, before decisions were made at both stages, notice-and-comment occurred. See id. at 51, 66-67 (describing the public involvement preceding the Needles and Grizzly decisions); see also 16 U.S.C. § 1612 (requiring “adequate” notice and comment opportunities); 36 C.F.R. § 219.10(b) (2000) (same). Thus, since the Needles and Grizzly decisions were made pursuant to authority delegated to the Forest Service by Congress, we must afford them Chevron deference.
Given the ambiguity of the Norbeck Act, I conclude the Forest Service’s interpretation is far from being “manifestly contrary” to that Act. Therefore, I believe this court should affirm the district court’s decision to approve the Forest Service’s interpretation of the Norbeck Act.
D. Final Concerns
Importantly, neither the majority nor the Sierra Club itself expressly alleges that the proposed timber harvesting would threaten the viability of any populations living in the Preserve. Cf. 36 C.F.R. § 219.19 (2000) (requiring the Forest Service to maintain viable populations in planning areas and defining “viable population” *1295 as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area”). While the viability of populations that rely on meadows and edges is threatened under the status quo-because the ponderosa pine stands continue to grow larger and older, see Aplee. SuppApp. at 48 (“Habitat conditions for all wildlife species, except those dependent on mature forests or old growth, is declining.”), permitting timber harvests would not threaten the viability of any population in the Preserve. The Forest Service specifically found that none of the forest management alternatives that it considered would have any effect on species listed as “threatened” or “endangered” under the Endangered Species Act. See id. at 65. Indeed, the Forest Service further found that the forest management plan it adopted would “significantly improve wildlife habitat diversity and capability,” ultimately resulting in overall improvement for wildlife. See ApltApp. at 29-30.
It is apparent that the majority is troubled by the possible effects logging would have on certain bird species “dependent on [large, unfragmented] pine stands in mature and old-growth forest.” Maj. op. at 1285 (citing Aplee. Supp.App. at 56A); see also id. at 1284 n. 2, 1289. The Forest Service, however, expressly accounted for this concern in its plan: “Because the Black Hills is still predominately forested, the Forest Service believes that a balance between edge and interior habitats can be achieved to provide the desired habitat diversity [for these bird species as well as for other species] within the Norbeck Wildlife Preserve.” Aplee. Supp.App. at 57. Chevron forbids this court from substituting its own judgment on such a technical matter for that of agency experts, absent some reason demonstrable in the record. The majority has not demonstrated any such reason.
CONCLUSION
Under Chevron, our review of Forest Service decisions managing a portion of our nation’s national forests is limited to the legal question of whether the Forest Service’s interpretation is, given the record, manifestly contrary to the Norbeck Act. This narrow scope of review is appropriate because, as the majority acknowledges, “[h]abitat management is a delicate venture.” Maj. op. at 1284. The majority’s decision delays even longer the implementation of forest management techniques the Forest Service considers necessary. See Aplts. App. at 49 (“The Needles area has not received any significant vegetative treatment in the last 25 years.”); id. at 65 (“The Grizzly Project Area has received little vegetative treatment in the last 30 years.”). Given the Norbeck Act’s ambiguity, I conclude that Chevron requires us to affirm.

. Catastrophic fires and epidemics are two more dangers to the homogenization of Nor-beck. See Aplts. App. at 28.

. While discussion has centered on the logging and timber sales associated with the Needles and Grizzly decisions, the majority is correct to note, see maj. op. at 1285, that commercial logging is only a part of the overall management plans for these areas. The plans also include prescribed fire, noncommercial logging, road construction and obliteration, and erosion control. See Aplts. App. at 49-64 (Needles Decision Notice), 65-75 (Grizzly Decision Notice).

.The environmental groups which challenged the Needles and Grizzly decisions by bringing this lawsuit agree that Norbeck is governed by overlapping statutes. See Appellees Opening Brief at 31 (agreeing that "Norbeck, as part of the National Forest System, is governed by multiple management statutes, including NFMA”).

. Here, I use "animals” broadly to include all types of "game animals and birds,” whatever this phrase means.

. The majority seems to acknowledge this ambiguity in footnote five. See maj. op. at 1288 n. 5.

. The same tension would exist if we concluded that “game animals and birds” meant "game animals and non-game birds.”

. Given the majority’s concern for the pygmy nuthatch, the three-toed and black-backed woodpeckers, and the northern goshawk— none of which are “game birds” — it appears the majority reads this phrase as either “game or non-game birds” or “non-game birds.” See maj. op. at 1284 n. 2, 1285.

. For example, the majority admits that the phrase defining the object of protection— "game animals and birds” — is " 'potentially ambiguous' in the sense that 'game animals and game birds' are not necessarily the same objects of protection as 'game animals and birds.' ” Maj. op. at 1288 n. 5.

. The "measure of [Skidmore ] deference ... var[ies] with circumstances, [like] the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency’s position.” Mead Corp., 121 S.Ct. at 2171.